# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF MICHIGAN

### SOUTHERN DIVISION

_____

SMARTMATIC USA CORP,
a Delaware corporation,

        Plaintiff,

v.

ZACHARY FIGUEROA, an
individual, and DOES 1-20,

        Defendants.

Case No. _____

Hon. _____

**COMPLAINT**

---

**TRAVERSE LEGAL, PLC**
C. Enrico Schaefer (P43506)
810 Cottageview Drive, Suite G-20
Traverse City, MI 49684
Telephone: 231-932-0411
Fax: 231-932-0636
enrico@traverselegal.com

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (admission *pro hac vice* pending)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: 415- 955-1155
Fax: 415-955-1158
karl@KRInternetLaw.com

---

**COMPLAINT**

Plaintiff Smartmatic USA Corp., by and through its attorneys Traverse Legal, PLC and Kronenberger Rosenfeld, LLP, bring this Complaint against Defendant Zachary Figueroa and Does 1-20, and allege as follows:

**INTRODUCTION**

1. One of the most pressing issues of our time is the attempt by special interest groups to covertly influence democratic elections by disseminating false and biased internet and social media content, ostensibly published by impartial and unrelated third parties.

2. This action concerns such clandestine efforts to delegitimatize democratic elections by attacking the election services provider through false and biased articles and internet postings.

3. This action also concerns the significant reputational and commercial harm that has been inflicted on businesses that are legitimate and essential parts of the democratic electoral process.

4. Plaintiff Smartmatic USA Corp ("Smartmatic") is an end-to-end election services provider. Smartmatic provides local, state, and national governments with election technologies and services designed to achieve the highest level of security, transparency, reliability, auditability, and usability for voters, poll workers, and election administrators.

5. Among other election-related services, Smartmatic develops, sells, implements, and monitors electronic voting systems.

6. Smartmatic has provided its election services in the United States and in numerous other countries and jurisdictions throughout the world.

7. As an example, between 2004 and 2017, Venezuela used Smartmatic's election services to administer national elections. These elections resulted in victories and losses across political lines. However, after the 2017 election, Smartmatic ceased operations in Venezuela after

Venezuela's National Electoral Council announced election results that differed from those reflected by Smartmatic's voting systems.

8.      On information and belief, beginning in 2013 or before, a group of individuals and/or companies, designated in this Complaint as Does 1-20 (collectively, the "Special Interest Group"), associated for the purpose of undermining the legitimacy of Venezuelan elections and attacking the reliability of the systems used to administer the elections.

9.      Part of the Special Interest Group's disinformation campaign was to attack Smartmatic, as the primary vendor of election equipment and services to the Venezuelan National Electoral Council (the "CNE") in various publications.

10.      Defendant Zachary Figueroa is a frequent editor and agent of Wikipedia, a web-based free encyclopedia of openly editable and viewable content located in California.

11.      Wikipedia requires its editors to disclose their affiliation with any person with respect to any compensation they receive for publishing or editing a Wikipedia article.

12.      On information and belief, on multiple occasions between 2016 and 2018, the Special Interest Group paid Figueroa to remove accurate, impartial, and balancing content from the Wikipedia article about Smartmatic and to publish one-sided, negative, and false content about Smartmatic without disclosing the identity of the Special Interest Group and without informing Wikipedia that he was being compensated by a third party for his work as a Wikipedia editor.

13.      Additionally, on information and belief, the Special Interest Group provided Figueroa with false and defamatory materials and sources, much of them in Spanish (a language that Figueroa does not read or understand) for Figueroa to use in editing the Smartmatic Wikipedia article. Figueroa relied on and incorporated those materials into the Wikipedia article about Smartmatic without independent verification.

14.     Moreover, on information and belief, the Special Interest Group paid Figueroa to request a "semi-protected" status for the Wikipedia article about Smartmatic so that Smartmatic and other editors could not edit the article to correct Figueroa's material falsehoods.

15.     Figueroa's and the Doe Defendants' conduct constitutes defamation in violation of Michigan law. Additionally, Figueroa's and the Doe Defendants' conduct violates California Penal Code section 641.3, which makes it unlawful for any agent to accept money without the consent of his employer (and for the payor to pay money) in return for the agent using his position for the benefit of the payor.

16.     Figueroa and the Doe Defendants benefitted from this bribery scheme by their continued association with the Special Interest Group.

17.     As a result of Figueroa's and the Doe Defendants' misconduct, Smartmatic has been and continues to be harmed.

## PARTIES

18.     Plaintiff Smartmatic is an active Delaware corporation based in Boca Raton, Florida.

19.     Defendant Zachary Figueroa is an individual residing in Wyoming, Michigan.

20.     Plaintiff does not know the true names and capacities, whether individual, associate, corporate, or otherwise, of Defendants sued herein as Does 1–20 inclusive, and Plaintiff therefore sues these Defendants by such fictitious names. Plaintiff will amend this complaint to state the true names and capacities of Does 1–20 once they have been discovered. Plaintiff is informed and believes, and, on that basis, alleges that each Defendant sued herein by a fictitious name is in some way liable and responsible to Plaintiff based on the facts alleged herein.

//

## JURISDICTION

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 for Smartmatic's claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.* This Court has supplemental jurisdiction over Plaintiff's claims arising under the laws of the State of Michigan and California under 28 U.S.C. §1367 because they are so related to Plaintiff's federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

22.     Venue is proper pursuant to 28 U.S.C. §1391 because Defendant Figueroa resides in this district.

23.     This Court has personal jurisdiction over Defendant Figueroa because he resides in Michigan and committed his misconduct from Michigan.

## BACKGROUND

### A.     Smartmatic

24.     Smartmatic provides end-to-end election services to local, state, and national governments.

25.     Smartmatic's mission is to increase integrity in the democratic process through enhanced citizen engagement and trust in election systems. Smartmatic works to harness the full power of technology to deliver reliable, accurate, and auditable election results.

26.     To that end, Smartmatic has developed a robust portfolio of technologies to improve the efficiency, accuracy, and transparency of elections.

27.     Smartmatic has provided its election services and implemented its election technologies in more than 307 US jurisdictions and 27 countries on five continents.

28.     Smartmatic is an approved U.S. Department of Defense vendor and a founding

member of the U.S. Department of Homeland Security's Council for the Election Infrastructure Subsector.

**B.     Smartmatic's Election Services in Venezuela**

29.     In 2003, the CNE requested proposals to provide electronic voting technology throughout Venezuela that would ensure accuracy, efficiency, and transparency.

30.     Based on its advanced technology and superior commercial offer, Smartmatic won the competitive bidding process and began providing elections services in Venezuela in 2004.

31.     Between 2004 and 2017, Smartmatic helped administer 15 national elections in Venezuela. More specifically, Smartmatic provided the CNE with an end-to-end voting solution, which automated every step of the election process, from voter authentication to vote casting to results publication. To this end, Smartmatic trained elections personnel, deployed voting technologies, and audited election results.

32.     The election services that Smartmatic provided in Venezuela featured new hallmarks of election technology, including the use of electronic voting with a paper trail (*i.e.* a voter-verified paper audit trail), which has now become the *de facto* standard worldwide. In 2012, Smartmatic helped administer the first ever nationwide election with biometric voting session activation, which automatically initiated voting sessions with people's biometric information.

33.     The Organization of American States, the European Union, and other important election-monitoring institutions, such as the Carter Center, tested and praised the election processes and technologies that Smartmatic implemented in Venezuela.

34.     As an example, the Final Report of the European Union's Electoral Observation Mission for Venezuela in 2005 concluded:

"The Venezuelan voting system possesses a number of features that are in line with

the most advanced international standards of e-voting. In certain aspects, such as the paper trail audit . . . the system developed in Venezuela is probably the most advanced system in the world to date."

35.    An additional notable example is the following statement made personally by President Jimmy Carter during the kickoff of the 2012 Annual Conversations at the Carter Center series: "As a matter of fact, of the 92 elections that we've monitored, I would say the election process in Venezuela is the best in the world."

36.    The elections that Smartmatic helped administer in Venezuela resulted in victories and losses across political lines and included: the re-election of President Hugo Chávez; the defeat of the 2007 Chavez-sponsored referendum to amend Venezuela's constitution to abolish term limits; the 2010 National Constituent Assembly elections that resulted in significant gains for the Democratic Unity Roundtable, which was formed to unify the opposition to the Chavez administration; the 2015 National Constituent Assembly elections that resulted in a two-thirds majority for the Democratic Unity Roundtable in coalition with the three indigenous representatives; and the initial election of President Nicolás Maduro following Chavez's death in 2013.

37.    In July 2017, the CNE engaged Smartmatic to assist in the administration of the election of a new National Constituent Assembly.

38.    Following that election, Smartmatic determined that the election authorities had interfered with the approved elections processes implemented by Smartmatic and announced election results that differed from the results reflected by Smartmatic's systems.

39.    Prompted by the actions of the CNE, Smartmatic publicly condemned the Venezuelan election authorities' announcement of the election results as illegitimate

40.     After its public denouncement of the actions of the Venezuelan election authorities in the 2017 election, Smartmatic ceased its operations in Venezuela.

41.     Venezuela's subsequent elections, including the May 2018 re-election of Nicolás Maduro, were not administered by Smartmatic. Smartmatic has publicly identified overt concerns about the integrity of these subsequent elections.

42.     Smartmatic continues to provide its election services in numerous other countries, including the United States.

**C.     Attacks on Venezuelan Elections Processes Between 2004 and 2018**

43.     During the 14 years that Smartmatic provided election services in Venezuela, baseless but vociferous criticism arose regarding the integrity and accuracy of these elections.

44.     On information and belief, among those involved in the criticism were individuals and businesses who had commercial interests in voting systems that compete with Smartmatic's voting systems. Others were individuals and businesses affiliated with various political groups opposed to the administration then in control.

45.     Beginning at least as early as 2013, a group of individuals and/or entities associated as the Special Interest Group for the purpose of discrediting Venezuelan election processes and results. The Special Interest Group has continued to function with this goal since its formation.

46.     Among other tactics, the Special Interest Group sought to publish false and one-sided news articles and social media posts questioning the integrity and results of Venezuelan elections.

47.     As part of this publication campaign, the Special Interest Group sought to attack Smartmatic and Smartmatic's technologies with false and/or one-sided statements.

48.     On information and belief, while the motives of the Special Interest Group in

attacking Smartmatic may have been primarily political, such motives likely included the commercial and profit objectives of at least some of the members of the Special Interest Group.

49.     On information and belief, between 2013 and 2018, the Special Interest Group paid multiple persons and entities to publish news articles and social media posts disparaging Smartmatic with false and/or one-sided statements

50.     On information and belief, in addition to paying the authors of the articles and posts, the Special Interest Group provided the content for the articles and posts, which included false and/or one-sided criticism of Smartmatic.

**D.     Wikipedia and Wikipedia Editors**

51.     Wikipedia is a web-based, free encyclopedia based on a model of openly editable and viewable content.

52.     Wikipedia is owned and operated by the Wikimedia Foundation, which is a Florida nonprofit corporation based in San Francisco, California.

53.     Wikipedia is the largest and most popular general reference work on the internet.

54.     Wikipedia is also one of the most viewed websites available on the internet, with hundreds of millions of unique page views each month.

55.     Google typically lists Wikipedia articles at or near the top of its search results, making it a near certainty that a Google search for a business will prominently feature the corresponding Wikipedia article.

56.     Wikipedia articles are drafted and continually revised by volunteer editors.

57.     Some Wikipedia articles can only be revised by registered editors who have been confirmed by Wikipedia. Additionally, new Wikipedia articles can only be published by registered and confirmed editors.

58.     Registered and confirmed Wikipedia editors also receive other Wikipedia privileges based on their seniority and level of editing activity, including enhanced editing options and increased privacy through the masking of their IP addresses.

59.     Registered and confirmed Wikipedia editors also have the ability to edit "semi-protected" Wikipedia Articles, where the article cannot be edited by unregistered and/or unconfirmed editors.

60.     Editors must agree to Wikipedia's Terms of Use to become registered and confirmed.

61.     Wikipedia's Terms of Use require editors to disclose their clients or affiliations with respect to any editing for which the editors receive compensation.

62.     Wikipedia Terms of Use also prohibit "intentionally or knowingly posting content that constitutes libel or defamation"; posting content "[w]ith the intent to deceive"; "posting content that is false or inaccurate"; and "misrepresenting your affiliation with any individual or entity". Wikipedia defines "affiliation" as "connections that might be relevant including, but not limited to, people or businesses who provide text, images, or other media for the paid edit."

63.     Wikipedia requires that all "encyclopedic content on Wikipedia must be written from a neutral point of view (NPOV), which means representing fairly, proportionately, and, as far as possible, without editorial bias, all of the significant views that have been published by reliable sources on a topic. NPOV is a fundamental principle of Wikipedia . . . ."

64.     Wikpedia's Terms of Use state that California law applies to any dispute regarding the Terms of Use or with Wikipedia.

//

//

**E.      Defendant Figueroa and his ZiaLater Wikipedia Account**

65.      Defendant Figueroa is an individual residing in Wyoming, Michigan, and a registered nurse.

66.      On information and belief, Figueroa does not read, write, speak or understand Spanish.

67.      Figueroa is an active Wikipedia editor.

68.      Figueroa holds a Wikipedia account in the name "ZiaLater," which he registered and confirmed on or before April 2013. Figueroa was only 19 years old at that time.

69.      By the time Figueroa was 20 years old, he had made thousands of Wikipedia edits.

70.      Over the past six years, Figueroa, using his ZiaLater account, has edited various Wikipedia articles more than 12,500 times, and ZiaLater has been awarded the title of Veteran Editor II by Wikipedia.

71.      In addition to his 12,500 article edits, Figueroa has published hundreds of Wikipedia articles.

72.      In making his 12,500-plus edits and drafting his 100-plus articles, Figueroa acted for and in the place of Wikipedia, and Wikipedia manifested its consent to have Figueroa draft and edit articles on its behalf. When Figueroa made his 12,500-plus edits and drafted his 100-plus articles, Wikipedia retained the right and ability to control Figueroa's editorial privileges, including the right to block his account or access to Wikipedia and to ban him as an editor.

73.      Figueroa has engaged in his editorial efforts on behalf of Wikipedia for a significant period of time (more than five years) and in connection with Wikipedia's core business, has exercised skill in drafting and editing Wikipedia articles beyond those of a typical layperson, and has relied on Wikipedia's medium and software tools to do so.

11

74.     The vast majority of Figueroa's Wikipedia edits and new articles have been to articles about Venezuela. Moreover, many of Figueroa's sources and references for his Wikipedia edits have been in Spanish. However, by his own admission, Figueroa does not speak Spanish. For example, in March 2014, Figueroa posted the following on the talk page of The Photographer: "No hablo español así que estoy usando un traductor." – which translates to "I do not speak Spanish so I am using a translator."

**F.     Figueroa's Acceptance of Commercial Bribes from the Special Interest Group**

75.     On information and belief, beginning in 2013 or earlier, the Special Interest Group began offering various reporters and editors money to author and revise articles related to Venezuela. The Special Interest Group's goal in these publications and revisions was to discredit the legitimacy of Venezuelan elections and to attack the reliability of the systems used to administer the elections.

76.     Among other lines of attack, the Special Interest Group sought to discredit Smartmatic, the principal election services provider in Venezuela from 2004 to 2017. A common technique to discredit a business is to fabricate ties with a polarizing government and its officials.

77.     In April 2008, a Wikipedia article about Smartmatic was published by a third party, which is located at <https://en.wikipedia.org/wiki/Smartmatic> (the "Smartmatic Article" or "Article").

78.     On information and belief, beginning in early 2013, the Special Interest Group began offering Figueroa money to author and edit various Wikipedia articles related to Venezuela.

79.     On information and belief, beginning in early 2016, the Special Interest Group began offering Figueroa money to edit the Smartmatic Article.

80.     On information and belief, between early 2016 and early 2018, Figueroa accepted

multiple payments from the Special Interest Group in exchange for editing the Smartmatic Article.

81.     On April 23, 2016, Figueroa began editing the Smartmatic Article using his ZiaLater Wikipedia account.

82.     Between April 23, 2016 and March 8, 2018, Figueroa edited the Smartmatic Article 92 times. Figueroa (editing as ZiaLater) is the most active editor of the Smartmatic Article, accounting for 33% of all edits and 47% of all added text.

83.     On information and belief, between April 23, 2016 and March 8, 2018, the Special Interest Group made multiple requests to Figueroa to edit the Smartmatic Article and made multiple payments to Figueroa for his ensuing edits.

84.     On information and belief, the Special Interest Group provided Figueroa the content to be added to, edited, or removed from the Smartmatic Article.

85.     Figueroa's lack of active involvement in selecting the content for the Smartmatic Article is evidenced by, among things, Figueroa's inability to understand Spanish, though he cited to Spanish resources to support his edits and additions to the Smartmatic Article.

86.     Thus, on information and belief, Figueroa recklessly accepted the Special Interest Group's edits to the Smartmatic Article as accurate and did not conduct any independent verification.

**G.     Figueroa's Edits to the Smartmatic Article**

87.     In his edits to the Smartmatic Article, Figueroa published multiple false, misleading, and/or baseless statements.

88.     These false and/or misleading statements include the following first sentence of the Article: "Smartmatic . . . is a *Venezuelan-owned* multinational company . . .  In 1997, *three Venezuelans* engineers, Antonio Mugica, Alfredo Jose Anzola, and Roger Piñate, began

collaborating in a group – which would later become Smartmatic . . ." [footnotes omitted from all quotations from the Article; all italics in quotations from the Article added for emphasis]

89.     From this very first sentence in the Article, Figueroa inaccurately refers to Smartmatic as "Venezuelan-owned," in order to falsely insinuate that Smartmatic is owned by (and therefore controlled by), or at the very least directly affiliated with, the Venezuelan State. Figueroa's statement is false. A corporation is not "owned" by a country simply because its founders, owners, or executives were born in that country. Smartmatic is not and has never been Venezuelan-owned. While Figueroa's purpose in publishing this statement was to interconnect Smartmatic and Venezuela, his statement is inaccurate; the rationale behind Figueroa's statement would mean that Tesla is "South-African owned" because its founder and CEO, Elon Musk, was born in South Africa, or that Google is "Russian-owned" because its founder and Director, Sergey Brin, was born in Russia.

90.     Following the first sentence, Figueroa thereafter edited the Article to emphasize the same false and accusatory theme—*i.e.* that a supposed association exists between Smartmatic and the Venezuelan government. One way in which Figueroa emphasized this false theme was by adding extraneous, irrelevant content to the Article about a second company, Bizta Corporation ("Bizta"). Regarding Bizta, Figueroa added the following statement to the Article: ". . . Bizta was awarded a $150,000 'loan' from Marieta Maarroui de Bolivar – wife of the then-Chavista governor Didalco Bolivar – who was president of FONCREI, the Venezuelan government's organization dedicated to industrial funding." Not only is this loan to Bizta wholly unrelated to Smartmatic and thus irrelevant to the Smartmatic Article, but it is also false and misleading. Contrary to this statement, the loan to Bizta referenced in the statement was made by FONCREI, Venezuela's equivalent of the U.S. Small Business Bureau—not by Ms. Maarroui de Bolivar or any other

individual.

91.     Following his reference to Bizta, Figueroa added the statement: "Smartmatic also received an additional $200,000 loan from the Chavez government." This statement is completely fabricated. In fact, the source that Figueroa cites for this edit, an Argentina internet publication called iProfessional, deleted the article upon being informed that it was incorrect. Figueroa accessed the deleted source through a web-based archive tool to continue to cite to it.

92.     Figueroa also added the following false statement in the same paragraph, which reflects an even more egregious attempt to tie Smartmatic to the Venezuelan government: "The deal with Bizta required the Venezuelan government to own 28% of Smartmatic and placed Venezuela's Head of the Council of Ministers and advisor to Hugo Chavez, Omar Montilla, on Smartmatic's board of directors." Figueroa misquoted the source that he cited for this highly libelous statement. In fact, contrary to Figueroa's statement, there was never any such "deal" between Smartmatic and the government of Venezuela; neither the government of Venezuela nor any other state entity has ever owned an interest in Smartmatic; and neither Mr. Montilla nor any other government official has ever been a member of the Board of Smartmatic.

93.     With respect to Smartmatic's commercial bid for the 2004 recall election (a bid that was ultimately successful), Figueroa wrote in the Article that Smartmatic formed a consortium that comprised "Smartmatic, Bizta, and *Venezuela's state-run* telecommunications organization CANTV." This statement is false and misleading, and again designed to emphasize the false theme that Smartmatic is associated with or under the control of the Venezuelan government. In actuality, at the time (*i.e.* 2004), CANTV was a private business, majority-owned and controlled by the U.S.-based company Verizon; CANTV was nationalized by the Venezuelan government only much later, in 2007.

94.     Figueroa also added inaccurate "technical" content to the Article with the intent of portraying Smartmatic in a negative light and further falsely tying Smartmatic to Venezuela. For example, Figueroa wrote:

> "Prior to the 2005 Venezuela parliamentary election, one technician could work around 'the machine's allegedly random storage protocols' and remove voting secrecy. Since the voting systems were Windows based and only randomized data, the technician was able to download a simple software that could place Windows files in order. Following this revelation, voter turnout dropped substantially with only 25% of registered Venezuelans voting and opposition parties withdrawing from the election. . . ."

This statement is inaccurate. There is no evidence that Smartmatic's voting technologies were compromised or that Smartmatic was in any way linked to low voter turnout in the 2005 Venezuelan election. Rather, as reported in major news media outlets throughout the world, the low voter turnout resulted from the decision by major political parties to boycott the 2005 Venezuelan election.

95.     In addition to the statements identified above, throughout the Smartmatic Article Figueroa added many additional false, misleading, and extraneous references to Bizta and other corporations and individuals, as well as to the Venezuelan government, all with the intention of harming Smartmatic by implying a corrupt or disreputable link to the Venezuelan government. As support for his misleading and negative content, Figueroa often cited obscure, sometimes inexistent, internet publications, including personal blogs, many of which may have been written and published by or at the direction of members of the Special Interest Group.

96.     Figueroa also deleted, and otherwise blocked the inclusion of, accurate, balancing, and relevant content that was contributed to the Smartmatic Article by other Wikipedia editors, including:

- "Smartmatic has been the main technology supplier for the last fourteen Venezuelan national elections. These are: 2004 Presidential Recall Election, 2005 Regional Elections, 2005 Municipal and Parrish Elections, 2005 Parliamentary Elections, 2006 Presidential Elections, 2007 Constitutional Referendum, 2008 Regional Elections, 2009 Constitutional Amendment Referendum, 2010 Parliamentary Elections, 2012 Presidential Elections, 2012 Regional Elections, 2013 Presidential Elections, 2013 Regional Elections and 2015 Parliamentary Elections."

- "Smartmatic has offices in at least 20 countries. A full list of Smartmatic's offices worldwide can be found on its official website."

- "In spite of all these rumors, relevant observation missions have validated the Venezuelan elections conducted using Smartmatic technology. In September 2012 former US President Jimmy Carter said 'the election process in Venezuela is the best in the world'."

- "In 2006, OAS Secretary General José Miguel Insulza said: 'we had no objection. It was fair' and that Venezuela 'has a strong electoral system that is technically very good.'"

- "The Report of the EU Observer Mission to the 2006 Venezuelan presidential election stated that it was overall conducted 'in respect of national laws and international standards," with 'a high turnout, and peaceful atmosphere'."

- "The US Embassy sent 120 observers across the entire country to witness the election

17

On May 11, 2010, the Embassy issued a statement congratulating the country for the democratic feat. The European Union Ambassador, Alistair MacDonald also issued a statement that it has been a 'smooth and generally trouble-free election.'"

97.    In a further effort to discredit Smartmatic, Figueroa included in the Article additional false, one-sided, and disparaging information relating to elections in other countries where Smartmatic provided election services. Consistent with his repeated efforts to associate Smartmatic with the government of Venezuela, Zialater has further tarnished Smartmatic's reputation by associating the company with authoritarian governments in other countries. With respect to elections in other countries, Zialater also selectively included negative information about Smartmatic and removed positive balancing information that was contributed by other Wikipedia editors. Examples of these additions by Figueroa include the following:

- "The Flemish government stated 'the Venezuelan Smartmatic fails for technical issues and demands that the system, which cost 40 million euros, will be improved by 2014'. There were nearly 2,000 incidents with 25% of them being technical issues, with some instances of voters casting a ballot twice for a candidate by quickly pressing the screen. Following the election, Flanders refused to pay 16.5% of the initial agreed payment due to Smartmatic's failure."

- "Some observers have alleged that Smartmatic had rigged elections in favor of Corazon Aquino's son, Benigno Aquino III, as well as his allied politicians who showed support for the company."

- ". . . Smartmatic's entry into the Philippines was controversial, with The Manila Times stating that 'only the truly uninformed would still find Smartmatic's combination of PCOS/VCM and CCS an acceptable solution to the automation of Philippine elections'

and that 'glitches' as well as the 'lack of transparency ... convinced us of the system's unreliability and its vulnerability to tampering'."

98.     Contrary to these statements, Smartmatic provided successful and highly-praised election services in Belgium between 2012 and 2018, and Smartmatic will serve as Belgium's exclusive election technology provider until 2027. Also contrary to these statements, no credible observer or news outlet has alleged that that Smartmatic rigged Philippine elections; Defendant's statements rely on unsupported opinions and editorial and not actual news coverage.

99.     On November 4, 2017, Figueroa added the following content to the Smartmatic Article.

> "Allegations surfaced that Alfredo José Anzola Jaumotte, a co-founder and Director of Finance of Smartmatic, grew to disagree with Smartmatic's relationship with Venezuela's Bolivarian government following the 2007 referendum when the government was accused of manipulating results. Shortly after the elections, Anzola became angered when the government demanded higher payments for fingerprint technology and threatened to reveal sensitive documents surrounding elections. On 27 April 2008, Anzola met with Bolivarian government officials to discuss payments and left upset with the government's payment ultimatum. The next day on 28 April 2008, Anzola and his attorney boarded a private flight destined for Curaçao to meet with Smartmatic shareholders to unveil the damaging documents against the Bolivarian government."

(the "Bribery Statement.")

100.    On March 8, 2018, Figueroa republished the Bribery Statement, but with one edit (the addition of the word "allegedly" in the second sentence) as follows:

"Allegations surfaced that Alfredo José Anzola Jaumotte, a co-founder and Director of Finance of Smartmatic, grew to disagree with Smartmatic's relationship with Venezuela's Bolivarian government following the 2007 referendum when the government was accused of manipulating results. Shortly after the elections, Anzola *allegedly* became angered when the government demanded higher payments for fingerprint technology and threatened to reveal sensitive documents surrounding elections. On 27 April 2008, Anzola met with Bolivarian government officials to discuss payments and left upset with the government's payment ultimatum. The next day on 28 April 2008, Anzola and his attorney boarded a private flight destined for Curaçao to meet with Smartmatic shareholders to unveil the reportedly damaging documents against the Bolivarian government."

101.    The Bribery Statement is false because the Venezuelan government never demanded and Smartmatic never paid any money to the government for the right, privilege, or ability to provide voting services in Venezuela.

102.    The Bribery Statement, like the rest of the paragraph, is a fabrication. In fact, in the corresponding Talk Page, another editor pointed out that Figueroa did not cite a source for these edits, in violation of Wikipedia's policy requiring that all content in a Wikipedia article be sourced. Figueroa tried to evade the other editor's comments by adding the word "allegedly," which does not change the intent, meaning, or veracity of the paragraph and remains in violation of Wikipedia policy.

103.    At a minimum, Figueroa acted recklessly regarding the falsity of the Bribery Statement, where Figueroa was being paid by the Special Interest Group to publish materials about Smartmatic, and where Figueroa could not assess the accuracy of the materials, including because

the cited sources were in Spanish, a language that Figueroa does not understand.

104. As a result of Figueroa's edits to the Smartmatic Article, Smartmatic's reputation has been harmed.

105. As a result of Figueroa's added content and edits to the Smartmatic Article, Smartmatic has lost money, including through the loss and reduction in business deals.

106. As a result of Figueroa's content and edits to the Smartmatic Article, Smartmatic has been harmed and has lost money, including through the costs of corrective advertising.

107. Given that Smartmatic is a leading global provider of voting technology that increases the transparency, efficiency and integrity of elections, Figueroa's actions strike at the heart of Smartmatic's business and integrity, and are therefore all the more damaging and causing of serious financial loss.

108. The harm to Smartmatic from the Smartmatic Article continues as of the filing of the Complaint.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ.*

109. Smartmatic realleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

110. California Penal Code §641.3 criminalizes commercial bribery and makes a violation of the statute punishable by imprisonment for more than one year where the amount of the bribe exceeds $1,000.

111. As such, a violation of California Penal Code §641.3 constitutes "racketeering activity," as that phrase is defined by 18 U.S.C. §1961.

21

112.    California Penal Code §641.3 makes it unlawful for any agent or employee to accept money from a person other than his/her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his/her position for the benefit of that other person.

113.    For purposes of California Penal Code §641.3, "employer" means a corporation, association, organization, trust, partnership, or sole proprietorship.

114.    For purposes of California Penal Code §641.3, "corruptly" means the person specifically intends to injure or defraud: (a) his or her employer, (b) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (c) the employer of the person from whom he or she requests, receives, or agrees to receive the money or a thing of value, or (d) a competitor of any such employer.

115.    On information and belief, on multiple occasions between April 23, 2016 and March 8, 2018, Figueroa violated California Penal Code §641.3 where: (a) Figueroa was acting as an agent of Wikipedia, (b) Figueroa accepted money from the Special Interest Group, and (c) in return, Figueroa used his position as a Veteran Editor II at Wikipedia for the benefit of the Special Interest Group.

116.    On information and belief, Figueroa engaged in this conduct corruptly, with the intent to harm both Wikipedia and Smartmatic with inaccurate and biased content that violated Wikipedia's Terms of Use.

117.    On information and belief, the Special Interest Group paid Figueroa in excess of $1,000 over the course of nearly two years to edit the Smartmatic Article.

118.    Figueroa's repeated violations of California Penal Code §641.3 constitute a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

119.     At all relevant times, the Special Interest Group constituted an "enterprise," as that term is defined in 18 U.S.C. §1961(4), namely a group of individuals associated in fact.

120.     Between at least April 23, 2016 and March 8, 2018, the Special Interest Group functioned as an ongoing organization of multiple persons and a continuing unit with a common purpose, namely the delegitimatizing of Venezuela's elections by, among other things, defaming Smartmatic.

121.     The Special Interest Group was at all relevant times separate and distinct from its pattern of unlawfully paying bribes to disseminate false and biased content about Smartmatic. On information and belief, the Special Interest Group engaged in other lawful and unlawful acts to further its purpose of discrediting Venezuelan election processes and results, including the publication of other articles and social media posts.

122.     The Special Interest Group's conduct affected interstate and foreign commerce in that Figueroa and the Special Interest Group published false information on Wikipedia and other online media that are viewable throughout the United States and the world. The goal of the Special Interest Group's conduct was to affect a foreign government, and the actual effect of Figueroa's conduct was the tarnishing of the reputation of Smartmatic, which conducts business in several countries throughout the world, including the United States. Actual and potential customers of Smartmatic in the United States and in other countries have viewed the Smartmatic Article.

123.     On information and belief, Figueroa was associated with the Special Interest Group between at least April 23, 2016 and March 8, 2018.

124.     By accepting the payments from the Special Interest Group in violation of California Penal Code §641.3, Figueroa participated in the Special Interest Group's affairs through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

125.     Figueroa's participation in the Special Interest Group's affairs through a pattern of racketeering activity has injured Smartmatic.

## COUNT II: VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200

126.     Smartmatic realleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

127.     On information and belief, on multiple occasions between April 23, 2016 and March 8, 2018, Figueroa violated California Penal Code §641.3 where: (a) Figueroa was acting as an agent of Wikipedia, (b) Figueroa accepted money from the Special Interest Group, and (c) in return, Figueroa used his position as a Veteran Editor II at Wikipedia for the benefit of the Special Interest Group.

128.     In engaging in the above-described conduct, Figueroa and the Doe Defendants have engaged in an unlawful business practice in violation of California Business and Professions Code §17200.

129.     In engaging in the above-described conduct, Figueroa and the Doe Defendants have engaged in an unfair business practice in violation of California Business and Professions Code §17200 because any utility of Figueroa's and the Doe Defendants' misconduct is far outweighed by the substantial gravity of harm to Smartmatic, to competition in the voting services industry, and to the interest of the general public in upholding democracy and free and fair elections.

130.     As a result of Figueroa's and the Doe Defendants' misconduct, Smartmatic has suffered an injury in fact, including: (1) harm to Smartmatic's reputation, (2) Smartmatic's expenditure of money caused by Figueroa's acts; and (3) the loss of money to which Smartmatic would have cognizable claim, including loss of business.

## COUNT III: DEFAMATION UNDER MICHIGAN LAW

131.    Smartmatic realleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein. Figueroa knowingly published the Bribery Statement as part of the Smartmatic Article.

132.    The Doe Defendants' provided substantial assistance to Figueroa in his publication of the Bribery Statement in the Smartmatic Article.

133.    On information and belief, the Smartmatic Article, containing the Bribery Statement, has been viewed by multiple third parties.

134.    The Bribery Statement is false because the Venezuelan government never demanded and Smartmatic never paid any money to the government for the right, privilege, or ability to provide voting services in Venezuela.

135.    Figueroa and the Doe Defendants acted without any privilege in publishing the Bribery Statement.

136.    On information and belief, Figueroa and the Doe Defendants acted at least recklessly regarding the falsity of the Bribery Statement, where Figueroa was being paid by the Special Interest Group to publish materials about Smartmatic, and where Figueroa could not assess the accuracy of the content, including because he did not understand Spanish.

137.    On information and belief, the Doe Defendants acted knowingly when providing substantial assistance to Figueroa in his publication of the Bribery Statement in that they knew the Bribery Statement was false when they provided it to Figueroa for publication in the Smartmatic Article.

138.    As a result of Figueroa's publication of the Bribery Statement, Smartmatic has been injured, including damages to its reputation.

139.    An award of exemplary damages is proper to compensate Smartmatic for the humiliation, sense of outrage, and indignity resulting from injustices maliciously, willfully, and wantonly inflicted by Figueroa and Does 1-20.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Smartmatic and against Figueroa and award the following relief to Smartmatic and against Figueroa:

A.  Adjudication that Figueroa's edits to the Smartmatic Article resulted from Figueroa's involvement in unlawful conduct in violation of California Penal Code §641.3 and 18 U.S.C. §1962;

B.  Adjudication that Figueroa's Bribery Statement that he added to the Smartmatic Article is defamatory;

C.  An injunction requiring Figueroa to remove all of his edits to the Smartmatic Article;

D.  Compensatory damages in an amount to be proved at trial under Michigan common law;

E.  Three times Smartmatic's compensatory damages under 18 U.S.C. §1964(c);

F.  Exemplary and punitive damages under Mich. Comp. Laws Ann. §600.2911;

G.  Smartmatic's attorney's fees under 18 U.S.C. §1964(c) and §600.2911;

H.  Costs of the suit;

I.  Interest on damages; and

J.  Such other relief as the Court may deem proper.

//

Respectfully Submitted,

Dated:   ___March 7, 2019___                    __/s/ C. Enrico Schaefer_____

**TRAVERSE LEGAL, PLC**
C. Enrico Schaefer (P43506)
810 Cottageview Drive, Suite G-20
Traverse City, MI 49684
Telephone: 231-932-0411
Fax: 231-932-0636
enrico@traverselegal.com

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (admission pro hac vice
pending)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: 415- 955-1155
Facsimile: 415-955-1158
karl@KRInternetLaw.com